UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

LIDIA MATOS, on behalf of Julio
Mota, a minor,

                          Plaintiff,          **MEMORANDUM AND ORDER**

          - against -                         05 Civ. 10539 (NRB)

JO ANNE B. BARNHART, Commissioner
of Social Security,

                          Defendant.

----------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     Ms. Lidia Matos, on behalf of her minor son, Julio Mota
("Mota" or "claimant"), brings this action pursuant to Section
405(g) of the Social Security Act, 42 U.S.C. § 405(g), to
challenge the final decision of the Commissioner of Social
Security ("the Commissioner") denying Mota's application for
Supplemental Security Income ("SSI") benefits.   Both parties
have moved for judgment on the pleadings pursuant to Fed. R.
Civ. P. 12(c).   For the reasons set forth below, the case is
remanded for further proceedings consistent with this opinion.

1

## BACKGROUND[1]

### A. Claimant's Personal and Procedural History

Julio Mota, now age 14, currently lives with his mother and other relatives. Tr. 216.[2] In September of 2002, Mota was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). Tr. 87 (Letter from Ramon Solhkhah, M.D., Director, Division of Child and Adolescent Psychiatry at St. Luke's-Roosevelt Hospital Center, dated Sept. 10, 2002). On October 17, 2002, Mota[3] filed an application for SSI benefits based on hyperactivity, asthma, and emotional disturbance. Tr. 54-57, 59. The Social Security Administration ("SSA") denied Mota's application on January 3, 2003, and Mota made a timely request for a hearing on January 21, 2003. Tr. 11, 26-29, 30. After an adjournment on December 2, 2004, Mota's hearing was held on January 20, 2005. Tr. 11, 199-224, 225. At the time of the hearing, Mota was twelve years old and in the sixth grade. Tr. 208. Six days later, on January 26, 2005, the ALJ issued a decision concluding that Mota was not eligible for SSI benefits. Tr. 11-23. The SSA's Appeals Council denied Mota's request for review on October 14, 2005, thus making the ALJ's decision the

---

[1] Except where indicated, there are no genuine issues regarding the following facts.

[2] "Tr." refers to the administrative transcript filed with defendant's answer in accordance with 42 U.S.C. § 405(g).

[3] While we will refer to actions by claimant, Mota, it is obvious that as he was a minor at the time, these actions were taken by his mother on his behalf.

2

final decision of the Commissioner.    Tr.  4-7;  42  U.S.C.  §
405(h).   On June 26, 2006, claimant filed the complaint in the
present case.

## B.  Medical Evidence

### 1.  Treating Physician Dr. Ramon Solhkhah

In June of 2002, after being suspended from school as a
third grader, and other behavioral issues, Mota began treatment
for his impairments with Dr. Ramon Solhkhah, M.D., Director of
the Division of Child and Adolescent Psychiatry at St. Luke's
Roosevelt Hospital.    Tr.  87.    This treatment consisted of
medication  management  and  weekly  individual  psychotherapy
sessions.   Id.   Dr. Solhkhah also met with Mota's mother and
stepfather for parent guidance work.   Id.   On September 10,
2002, in a letter describing Mota's diagnosis and treatment
recommendations, Dr. Solhkhah noted that although Mota had shown
substantial improvement, his global assessment of functioning
("GAF")  score  of  48  met  the  criteria  for  the  Seriously
Emotionally  Disturbed.[4]    Id.    Dr.  Solhkhah  subsequently
prescribed Concerta to Mota to treat his ADHD.   Id.; Tr. 88.
Dr. Solhkhah continued treating Mota and as of November 4, 2004,

---

[4] The Global Assessment of Functioning is measured on a scale of
0 - 100, with a higher number associated with higher functioning.   A
GAF rating between 41 to 50 indicates that patient has either some
serious symptoms (e.g., suicidal ideation, severe obsessional rituals,
or frequent shoplifting) or any serious impairment in social,
occupation, or school functioning (e.g., no friends, or unable to keep
a job).   American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders 34 (4th ed. 2000).

3

Mota was still attending individual therapy sessions. Tr. 151. Mota also continued to take medication for his ADHD, but switched to Strattera, and then to Adderall by 2004. Tr. 137, 151.

Dr. Solhkhah's evaluation, dated December 1, 2004 and submitted to the SSA, concluded that Mota had marked impairments in five of the six domains used to evaluate if a claimant's impairment is functionally equivalent to one listed in the Social Security regulations. Tr. 150-154 (Children's Mental and Physical Impairment Evaluation, dated Dec. 1, 2004). Specifically, Dr. Solhkhah found that Mota suffered from marked impairments in the following domains: acquiring and using information; attending and completing tasks; interacting and relating with others; caring for self; and health and physical well-being. Dr. Solhkhah stated that there was no evidence that Mota was impaired in the domain of moving about and manipulating objects. Id. In addition, he noted that Mota had the prominent symptoms for ADHD, including hyperactivity, impulsivity, inattention, and poor executive functioning. Tr. 150.

## 2. Consulting Physicians

On December 6, 2002, two SSA consulting physicians examined Mota, and subsequently provided evaluations for his claim. First, Dr. Emma Florez, an M.D., diagnosed him with ADHD and mild asthma. Tr. 112. Dr. Florez noted in her evaluation that

Ms. Matos explained that her son's behavior had improved due to his medication and denied that he had any emotional problems. Id. In addition, Dr. Florez concluded that both the claimant's asthma as well as his ADHD were under control with the aid of his medication. Id. Second, Dr. Richard King, an M.D. specializing in psychiatry, also examined Mota on December 6, 2002. Tr. 113. Although observing that Mota was fidgety during the session, Dr. King concluded that Mota demonstrated age appropriate behavior at home and with his peers, but below age appropriate behavior in school. Tr. 113-114. Further, Dr. King diagnosed Mota with conduct disorder, learning disorder, and ADD with childhood hyperactivity. Tr. 114. Dr. Karen Prowba, a state agency review physician, reviewed the record as of December 30, 2002 and determined that Mota had severe impairments but did not have a marked limitation in any domain. Tr. 115-120 (Childhood Disability Evaluation Form, dated Dec. 26, 2002). Dr. Prowba's opinion was rendered two years prior to Dr. Solhkhah's opinion, and thus she did not rely upon his findings when reviewing the record.

## C. Academic Records and Evaluations

In addition to medical evidence, a significant portion of the record consists of information about Mota's performance at school, including disciplinary actions, records of academic performance, and observations made by teachers and school

5

officials.   We shall now describe documents from each academic year as appears in the record.

## 1.  **Academic Year 2001-2002**

Mota's academic and behavioral problems are documented in the record starting in the 2001-2002 academic year, when Mota was in the third grade.  On January 7, 2002, in an evaluation made by his teacher using the Conner's Teaching Rating Scale,[5] Mota received the most serious rating of "very much" in the following behavioral categories:    excitable and impulsive; restless, always up and "on the go"; mood changes quickly and drastically; and disturbs other children.  Tr. 158.  Further, he received the second most serious rating of "pretty much" in the categories of:    restless in the "squirmy" sense, constantly fidgeting; short attention span; easily frustrated in efforts; and inattentive and distracted.  Id.  In addition, since the end of Mota's third grade year, he has received an Individualized Education Plan ("IEP").[6]   Tr. 89-90.   Mota's IEP dated June 20,

---

[5] The Conner's rating scale is used to determine the teacher's view of a child's behavior in the classroom.  Matthew Cordes and T.F. McLaughlin, "Attention Deficit Hyperactivity Disorder and Ratings Scales with a Brief Review of the Conners Teacher Rating Scale (1998), International Journal of Special Education, 2004, Vol. 19, No. 2, available at
http://www.internationalsped.com/documents/cordes%20(4).doc.

[6] An IEP is a written document developed for eligible pre-school and school age students with a disability in accordance with the Individuals with Disabilities Education Act ("IDEA").    The IEP documents the student's eligibility for special education services and records the school's plan for providing the student with a "free appropriate education" in the "least restrictive environment."   New

2002 noted that he was emotionally disturbed and recommended that he receive general education with individual counseling for 30 minutes once a week to "improve self-esteem and impulse control," and group counseling with two other children for 30 minutes once a weekly to "improve social skills." Tr. 89, 90, 91, 93, 98, 127. Although Mota's academic skills were described as "average for his age and his grade," the IEP states that he was "experiencing behavioral difficulties in the classroom." Tr. 92. Mota's social and emotional performance was marked with his "preoccup[ation] with issues [related] to his home environment," which was manifesting itself in the form of "agitation which [he] exhibits with peers and authority figures." Tr. 93. Further, Mota was described as being "physically and verbally abusive when angered," although he was responsive when given individualized attention and encouragement. Id. Mota was described as demonstrating a lack of "boundaries with adults when his needs are not met immediately," id., and his annual goals included "improved self-concept" and learning to "cope with conflict" by avoiding angry confrontation with peers and expressing "anger with

---

York City Department of Education, Individualized Education Program Manual 1 (Dec. 2004), available at http://schools.nyc.gov/NR/rdonlyres/69D78629-9B1B-4247-A23B-C09B581AFAB1/2962/THENEWIEPMANUALJANUARY2005.pdf.

nonaggressive words rather than physical action or aggressive words." Tr. 95.

A series of disciplinary actions taken against Mota during his third grade year evince further behavioral problems. In December of 2001, Mota was suspended from school for fighting with another student. Tr. 157. He was again suspended on February 28, 2002 for five days. Tr. 159. As a result of his behavioral problems, Ms. Matos was "called to school" to pick Mota up and take him home on April 24, 2002, and to accompany Mota and observe him during the school day, "per [his teacher's] agreement with our school administration" on May 16, 2002. Tr. 160, 161.

## 2. **Academic Year 2002-2003**

On October 10, 2002, in the fall of Mota's fourth grade year, the assistant principal of Mota's school reported that he was "doing well with behavior, but still shows a bad temper. However, these have been less frequent. His school work is good as of now." Tr. 109. However, two weeks later, on October 24, 2002, Mota was suspended for fighting in the school yard. Tr. 162. He was also suspended on January 28, 2003 for two days for punching a girl in the face for taking his chair, Tr. 163, and again on February 13, 2003 for touching a female student in an inappropriate place. Tr. 164.

8

In November of 2002, Ms. Lannie, Mota's fourth grade teacher, completed a questionnaire after about two and a half months teaching Mota full-time. Tr. 101-108. Ms. Lannie reported that Mota had been suspended "a few times," Tr. 101, and that her opinion was based on "knowledge of Julio's involvement with fights outside of the classroom," frustration and impatience regarding completion of classroom tasks, a few occasions in which he left the classroom without permission, and instances of aggression toward other boys in the hallway. Tr. 106. According to Ms. Lannie, Mota had problems functioning in three of the six domains she was asked to evaluate: attending and completing tasks, interacting and relating with others, and caring for himself. Tr. 101-108. Within each domain, Ms. Tanner evaluated the frequency of specific examples of activities and behavior. Id. Specifically, in the domain of attending and completing tasks, she found that Mota had slight problems with paying attention when spoken to directly, and completing class and homework assignments. Tr. 103. For the domain of interacting and relating with others, Mota is described as having an "obvious problem" with expressing anger appropriately and following rules, and slight problems with asking permission appropriately and respecting and obeying adults in authority. Tr. 104. Lastly, in the domain of caring for himself, Mota is described as having an obvious problem in

9

identifying and appropriately asserting emotional needs and in responding appropriately to changes in his own mood (e.g., calming himself). Tr. 106. Mota also is observed to have slight problems with handling frustration appropriately, being patient when necessary, using good judgment regarding personal safety and dangerous circumstances, and using appropriate coping skills to meet daily demands of the school environment. Id.

## 3. Academic Year 2004-2005[7]

The record is replete with evidence from the 2004-2005 academic year describing Mota's behavioral and academic problems while in the sixth grade. In October 21, 2004, Mota's Social Studies teacher sent home a note which indicted he had not been doing his classwork or homework, was failing to follow directions and to show respect to the teacher, and creating disturbances in class. Tr. 149. That day, the school decided to require that Mota remain at home until his doctor prescribed a new medication, explaining that since "the beginning of the school year, [Mota] has had behavioral problems which stem from his emotional disability." Tr. 148.

On November 15, 2004, Ms. Tracey, Mota's school counselor, noted that Mota was "having difficulty behaving in class" and "controlling his temper," and had received an in school

---

[7] For reasons that are not readily apparent, the record does not include any school documents from the 2003-2004 academic year.

10

suspension.  Tr. 136.  She further noted that Mota's behavior had greatly improved since they had begun their sessions, and that Mota was "always extremely pleasant during [their] sessions and appears to be aware of the consequences of his actions." Id.  Ms. Tracey subsequently completed a questionnaire on November 19, 2004, wherein she noted she had been working with Mota twice a week for three months.  Tr. 128-136.  Ms. Tracey observed that Mota had problems functioning in the same three domains previously noted by Ms. Lannie two years previously: attending and completing tasks; interacting and relating with others; and caring for himself.  Id.  Specifically, in the domain of attending and completing tasks, Ms. Tracey noted slight problems in the areas of paying attention when spoken to directly, sustaining attention during play and sports activities, focusing long enough to finish assigned activities or tasks, and completing assignments.  Tr. 130.  Ms. Tracey documented slight problems in the domain of interacting and relating with others, with regard to expressing anger appropriately, asking permission appropriately, following rules, respecting and obeying adults in authority, and using language appropriate to the situation and listener.  Tr. 131.  In addition, Ms. Tracey expressed concern that Mota has a problem controlling his temper, and stated that he received an in school suspension due to his actions.  Id.  Ms. Tracey also stated that

11

Mota would become restless and fidgety when nervous or anxious. Tr. 132.    Finally, in the domain of caring for himself, Ms. Tracey noted slight problems in the areas of handling frustration appropriately, being patient when necessary, identifying and appropriately asserting emotional needs, responding appropriately to changes in his move (e.g., calming self), and knowing when to ask for help.   Tr. 133.

Mota's problems at school extended to the realm of academic achievement.   In a November 10, 2004 report card, Mota failed Math, Social Studies, and Science (with respective marks of 55, 55, and 65), but his teachers noted that he was approaching grade-level standards in these subjects.   Tr. 155.   Further, although Mota received an 80 in English, and was described as "attentive in class," several teachers commented that Mota was disruptive or failed to follow other instructions in class.   Id.

In January of 2005, Mota was involved in several incidents and experienced academic challenges as detailed in a series of letters from school teachers and officials.   His social studies teacher, Ms. Spencer, had to call school security to escort Mota from the classroom after he had created a disruption.   Tr. 144. The teacher explained that she felt Mota was a "threat to [her] safety and the safety of other students" because this was the second time that, in her words, Mota had been "explosive" in class.   Id.   Also, after an incident in which Mota had to be

12

physically restrained, the school dean, Mr. Mac, noted that Mota was "having trouble lately with his emotions/temper." Tr. 145. Finally, Mota's math and homeroom teacher expressed concerns that his behavioral issues, particularly his distractibility, were interfering with his academic performance as evidenced by the fact that Mota was failing math for the second time. Tr. 146-147. Further, she noted that when she would ask Mota to stay on task, he would become belligerent. Tr. 147.

A teacher's report, dated January 24, 2005, was completed by Mota's Math, Science, and Social Studies teachers. Mota's teachers described him as not having difficulties in the areas of language functioning, perceptual and motor skills, and academic skills. Tr. 165. Mota's Math teacher specifically described him as being a "facile math student" who "displays mathematical logic" and as having a "good approach to problem-solving." Tr. 166. Mota's Science teacher stated that he was a "good student" but needed to "settle down and focus on the task at hand," as his classwork and homework "are almost always incompleted [sic]." Id. Mota's Social Studies teacher detailed that he had a "very hard time focusing during class" and consequently rarely completed his work, and described Mota as having "difficulties interacting with adults," and that he "has been disrespectful and even violent" during class. Id.

13

In light of his difficulties, Mota's Individualized Education Plan was amended in June of 2005, when it was advised that Mota be placed in a special class with twelve students and two teachers.   Tr. 185-192.   The IEP noted that Mota's "emotional and behavioral needs require[d]" this adjustment. Tr. 192.   Mota was described as having demonstrated "difficult controlling his anger and poor frustration tolerance."   Tr. 188. Further, Mota was having difficulty relating well to teachers and was described as being "oppositional and defiant at times." Id.

## DISCUSSION

### A. Standard of Review

In reviewing a Commissioner's final decision under the Social Security Act, the findings of the Commissioner as to particular facts are conclusive if supported by "substantial evidence."   See 42 U.S.C. § 405(g).   Thus, we are to remand, modify, or reverse an ALJ's decision only if the ALJ has misapplied the appropriate legal standard, or if the finding is not supported by substantial evidence in the record as a whole. See, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 105-106 (2d Cir. 2003) (citing Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000)); 42 U.S.C. § 405(g).   Substantial evidence is "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a

14

conclusion." Brown on Behalf of Brown v. Chater, 932 F.Supp. 71, 77 (S.D.N.Y. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). This standard applies not only to the findings of fact, but also to the inferences and conclusions drawn by the Commissioner, which must be affirmed even if we are able to justify a different result on our own. See Jones v. Barnhart, No. 04 Civ. 8421 (GEL), 2006 WL 463954, at *3 (S.D.N.Y. Feb. 21, 2006).

Despite this deferential standard of review, administration decisions are frequently subject to judicial reversal, given the plethora of procedural obligations dictated in the regulations to which an ALJ must "scrupulously adhere." Garcia v. Barnhart, No. 01 Civ. 8300 (GEL), 2003 WL 68040, at *3 (S.D.N.Y. Jan. 7, 2003). The failure to do so constitutes legal error requiring a reversal of an ALJ's decision. See, e.g., id. (noting that "administrative decisions regarding claimants' eligibility for disability benefits have proven surprisingly vulnerable to judicial reversal" in light of the required procedural obligations under the regulations); Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) ("Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct

legal standards is grounds for reversal.") (quoting <u>Townley v. Heckler</u>, 748 F.2d 109, 112 (2d Cir. 1984)). Thus, in our review of the administrative agency's determination denying benefits, we cannot simply accept the agency's decision "because a cursory review of the record reveals plausible testimony or documentary evidence or expert opinion" that supports it. <u>Garcia</u>, 2003 WL 68040, at *4. Rather, we must subject the record to scrutiny to determine whether the Commissioner, in arriving at her conclusion, "fully complied with all of the relevant regulations." <u>Id.</u>

## B.  **Multi-Step Procedure to Determine Eligibility**

The SSI program was established to provide individuals who are either over the age of 65, blind, or disabled with benefits if they meet certain statutory requirements. 42 U.S.C. § 1381. To qualify for SSI benefits, a disability claimant must have:

> a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c (a)(3)(C)(1).

To reach a determination that a claimant under the age of eighteen qualifies for disability benefits, the ALJ must determine: (1) that the child is not engaged in substantial gainful activity; (2) that the child has an impairment or

16

combination of impairments that is severe; and (3) that the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. § 404. See Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 84 (2d Cir. 2003); 20 C.F.R. § 416.924(b)-(d); see also Garcia v. Commissioner of Social Security, No. 01 Civ. 4333 (BSJ), 2006 WL 212370, at *1 (S.D.N.Y. Jan. 27, 2006). To medically equal a listed impairment, the claimant's impairment must be at least equal in severity and duration to one described in the listing. 20 C.F.R. § 416.926(a). For ADHD specifically, to meet the required level of severity, the impairment must satisfy both the A and B criteria outlined in the 112.11 listing. 20 C.F.R. § 404, Subpt. P. App. 1, 112.11. To meet the A criteria, there must be medically documented findings that the claimant suffers from marked inattention, marked impulsiveness, and marked hyperactivity. Id. To meet the B criteria, the claimant must also suffer from marked impairment in two of the following four categories: (1) age-appropriate cognitive/communication function; (2) age-appropriate social functioning; (3) age-appropriate personal functioning; and (4) maintaining concentration, persistence, and pace. Id.; see also 20 C.F.R. § 404, Subpt. P. App. 1, 112.02(B)(2).

If the claimant's impairment does not meet or medically meet a listed disorder, then the ALJ must determine if the

17

impairment functionally equals a listed impairment by examining the claimant's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. §§ 416.926a(a), 416.926a(b)(1). The claimant must either demonstrate an extreme limitation in one domain or a marked limitation in two domains in order to establish functional equivalence and consequently qualify for benefits.[8]  20 C.F.R. 416.926a(a).

## C. **Treating Physician's Rule**

SSA regulations require that an ALJ give controlling weight to the treating physician's opinion as to the nature and severity of the claimant's impairments when it is "well-supported" by medically acceptable clinical and laboratory diagnostic techniques and is "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(d)(2); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). If the ALJ decides not to give the treating source's opinion controlling weight, then he must apply a series of factors in order to determine what weight to give the opinion. 20 C.F.R.

---

[8] An extreme limitation interferes very seriously with a claimant's ability to function, whereas a marked limitation interferes seriously with claimant's ability to function in a particular domain. 20 C.F.R. §§ 416.926a(e)(2)(i), 416.926a(e)(3)(i).

18

§416.927(d)(2).   These factors include:   (1) the frequency of examination and the length, nature, and extent of the relationship; (2) the evidence supporting the opinion; (3) the opinion's consistency with the record as a whole; and (4) if the treating physician is a specialist.   See id.; Shaw, 221 F.3d at 134.

In addition, the regulations require that the ALJ provide "good reasons" for the weight accorded to the treating physician's opinion.   20 C.F.R. § 416.927(d)(2).   Although a treating physician's statement that the claimant is disabled is not by itself determinative, the ALJ must explain the weight it gives to such opinions.   Aronis v. Barnhart, No. 02 Civ. 7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (quoting Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)).   Further, this Court should not hesitate to remand in situations where the ALJ fails to "comprehensively set forth reasons for the weight assigned to a treating physician's opinion."   Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004).

## D.  ALJ's Decision

In applying the first two steps of the three-step analysis described above, the ALJ in this case found that Mota had never engaged in substantial gainful activity and that Mota's ADHD was "severe" as defined by the Social Security Act because it imposed more than a slight limitation on his functioning.   Tr.

19

at 14, 22-23.   The ALJ also concluded that Mota's bronchial asthma was a "non-severe" impairment, noting that he was able to participate in athletics and that there had been no recent hospitalizations.   Id.   In addition, the ALJ determined that plaintiff's ADHD did not meet or medically meet a listed impairment.   He concluded that Mota did not meet the "A" criteria for listing 112.12 because Mota did not suffer from marked inattention, and consequently did not evaluate whether Mota met the listing's "B" criteria.   Tr. 19.

Next, the ALJ turned to the functional equivalency assessment.   The ALJ recognized the six domains to be considered, and acknowledged that if the claimant had extreme limitations in one area of functioning or marked limitations in two areas, his impairment would be considered functionally equivalent to a listed impairment.   See id.   The ALJ found that Mota suffered from a marked limitation only in the domain of interacting and relating to others, and that Mota suffered a less than marked impairment in the other five of the six domains.   Tr. 19-22.   Thus, the ALJ concluded that plaintiff's limitations caused by his impairment did not functionally equal those of a listed impairment.   Tr. 22.

We find that the ALJ failed to accord to Dr. Solhkhah's opinion as Mota's treating physician the deference required by the SSA regulations.   While the ALJ recited that Dr. Solhkhah's

20

findings were "entitled to significant weight since the findings are well supported by medically acceptable techniques," Tr. 22, nevertheless the ALJ reached conclusions which differed from those of Dr. Solhkhah without adequately explaining why Dr. Solhkhah's opinion should not be accorded controlling weight. In addition, the ALJ failed to apply the appropriate factors in determining how much weight to assign to Dr. Solhkhah's opinion. Such a contravention of the requirements under the regulations by the ALJ requires a remand.

The ALJ violated the dictates of the regulations with regard to the opinion of the treating source in several distinct ways. First, the ALJ substituted his personal observations for those of the treating physician. For example, in concluding that Mota's impairments did not meet the "A" criteria of the listing, the ALJ stated that he:

> does not credit the treating sources evaluation because the claimant was observed at the hearing and for half an hour or so during the hearing [and] the claimant had no problem paying attention. More importantly, the claimant was able to perform satisfactorily in his regular 6th grade English (reading/writing) classes . . . [suggesting that] he was "attentive in class" and quite capable of paying attention and concentrating.

Tr. 19. The substitution by the ALJ of his observation of Mota during a half hour hearing for the conclusion of a treating physician violates established case law. See, e.g., Green-Younger, 335 F.3d at 106; Balsamo v. Chater, 142 F.3d 75, 81 (2d

Cir. 1998) ("[I]t is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.'") (quoting McBrayer v. Secretary of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)); Wagner v. Secretary of Health and Human Services, 906 F.2d 856, 862 (2d Cir. 1990) ("[A] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion."). Thus, the ALJ's personal observation that Mota could "pay attention" for thirty minutes is insufficient to reject the medical opinion of Mota's treating physician.

Second, and more generally, the ALJ failed to support his rejection of the conclusions of Mota's treating physician. Although the Commissioner argues that "the ALJ stat[ed] in detail that he discounted Dr. Solhkhah's opinion because it was inconsistent with plaintiff's testimony and documentation from teachers and doctors," see Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and In Support of the Commissioner's Cross-Motion for Judgment on the Pleadings ("Def. Mem.") at 26-30, we fail to find such detailed reasoning

22

in the ALJ's opinion. Further, our review of the administrative record does not suggest that the Commissioner implicitly considered the factors required to evaluate the treating physician's opinion, nor that Dr. Solhkhah's opinion was inconsistent with the record as a whole.

The regulations explicitly state that the "longer · a treating source has treated" a claimant, the more "weight [the ALJ] will give to the source's medical opinion." 20 C.F.R. § 416.927(d)(2)(i). Dr. Solhkhah had treated Mota on a weekly basis for over two years at the time of the hearing. Tr. 87, 150. As such, Dr. Solhkhah's interactions with Mota were extensive and far greater than the limited interviews of the two consultative examining physicians, who issued opinions two years prior to that of Dr. Solhkhah, and had met Mota only once.

In addition, under the regulations, the "more a medical source presents relevant evidence to support an opinion," the more weight the ALJ is to assign to the opinion. 20 C.F.R. § 416.927(d)(3). Here, the ALJ concluded that Dr. Solhkhah's findings were "well supported by medically acceptable techniques." Tr. at 22. Therefore, by the ALJ's own reasoning, lack of supportability cannot be the basis to accord the treating physician's opinion less weight.

Further, the regulations dictate that the more consistent the treating source's opinion is "with the record as a whole,"

the more weight it should receive.    20 C.F.R. § 416.927(d)(4).
The dearth of references to Dr. Solhkhah's opinion in the ALJ's
decision strongly suggests that the ALJ failed to evaluate its
consistency with the record as a whole.  As mentioned above, in
assessing whether Mota's impairment was functionally equivalent
to one in the listings, Dr. Solhkhah concluded that Mota
suffered from marked impairments in five of the six domains.
See Tr. 150-54.    However, the ALJ only mentions Dr. Solhkhah's
opinion as it relates to one of the six domains.    Tr. 20-22.
The ALJ's evaluation of the domain of "acquiring and using
information" is the sole instance for which the ALJ specifically
considered Dr. Solhkhah's opinion in reaching his conclusions.
However, even here, the ALJ fails to provide an adequate reason
for justifying his rejection of the treating physician's
opinion.    When assessing the domain of "acquiring and using
information," the ALJ addressed Dr. Solhkhah's opinion that Mota
suffered from a marked impairment in the field by citing Mota's
success in English class, concluding that "the treating
psychiatrist's evaluation of marked limitation in this area was
inconsistent with the evidence in the record."    Id. at 10.    The
ALJ's cherry-picking of Mota's success in a single class does
not give fair consideration to the evidence of years of
behavioral problems at school as well as numerous and serious
academic failures.    For example, the relatively strong mark of

24

80 in English, which the ALJ relies upon heavily as evidence of Mota's academic achievement, was from the same 2004 report card which shows failing grades of 55 in Social Studies and Math, and a 65 in Science. Tr. 155. Further, even in those subjects in which Mota achieved passing grades, teachers noted that Mota was disruptive and failed to follow instructions in class. Id. Coupled with the series of notes from school teachers and administrators during the 2004-2005 academic year illustrating Mota's continued behavioral and academic problems in school, Tr. 144-149, Dr. Solhkhah's conclusions with regard to this domain are clearly consistent with the record as a whole.

Dr. Solhkhah's opinion was not mentioned in the rest of the ALJ's assessment of the other domains, despite Dr. Solhkhah's belief that Mota had a marked limitation in four of the remaining five domains. In the domain of "attending and completing tasks," the ALJ looked only to academic evidence to support the conclusion that Mota had a less than marked limitation in this domain, Tr. 20, but neglected to adequately evaluate the complete academic picture, including Mota's poor performance as evidenced by his 2004 report card, Tr. 155, and the school notes from the 2004-2005 academic year documenting Mota's continued behavioral and academic problems. Tr. 144-149. In assessing Mota's capacity to "care for [him]self," Dr. Solhkhah's opinion stated that Mota's marked impairment in this

25

domain harmed his ability to follow safety rules and avoid dangerous situations. AR 153. However, in concluding otherwise, the ALJ made no reference to Dr. Solhkhah's opinion, and instead pointed to Mota's capacity to perform age appropriate activities as evidence for a less than marked limitation in this domain. Tr. 21. In reaching this conclusion, the ALJ also disregarded other evidence, such as the consulting psychiatrist's observation that Mota demonstrated below age-appropriate behavior at school, and documented concern from school officials about Mota's "explosive" behavior. Tr. 114, 144-149. In the domain of "health and physical well-being," although the ALJ stated that the "testimony about the claimant's symptoms and limitations is mostly credible," he concluded that there was no disabling impairment, since the record showed that his ADHD symptoms showed improvement after medication and that his asthma was not severe. Tr. 21-22. Even for the domains in which the ALJ agreed with Dr. Solhkhah's assessment, that of a marked limitation in "interacting and relating with others," and that of no limitation in the domain of "moving about and manipulating objects," the ALJ makes no mention of the treating physician's opinion in arriving at his conclusions.

The consistency of Dr. Solhkhah's opinion with that of the rest of the record is particularly apparent in the fifth domain,

"caring for himself." In this domain, the ALJ considers "how well [claimants] maintain a healthy emotional and physical state, including how well [claimants] get [their] physical and emotional wants and needs met in appropriate ways" and "how [they] cope with stress and changes in [their] environment." 20 C.F.R. § 416.926a(k). In addition to Dr. Solhkhah's opinion that Mota had a marked limitation, the teacher questionnaires from both 2002 and 2004 indicated concerns about Mota's ability to function in this domain. Tr. 106, 133. The notes from school teachers and administrators during the 2004-2005 academic year illustrating Mota's continued behavioral and academic problems in school, Tr. 144-149, are also consistent with Solhkhah's opinion that the claimant suffers from marked limitations in this domain.

Finally, under the regulations, an ALJ will generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. § 416.927(d)(5). Dr. Solhkhah is a child and adolescent psychiatrist: it cannot be said that he is lacking in expertise in evaluating Mota's condition. Nor is there any indication from the ALJ's decision that there were "other factors" taken into consideration which tended to contradict the opinion of Dr. Solhkhah, as would be consistent with the regulations. See 20 C.F.R. § 416.927(d)(6).

27

Dr. Solhkhah's report, as Mota's treating physician, was the only expert evidence in the record made contemporaneously with Mota's hearing before the ALJ. The only contrary expert opinions were that of consultative physicians made two years earlier. Further, Dr. Solhkhah's opinion is uncontradicted and supported by evidence from Mota's 2004-2005 academic year, the time at which the ALJ's hearing was held. As such, we can only conclude that the ALJ failed to adequately assign weight to Dr. Solhkhah's opinion in accordance with the dictates of the applicable regulations, and in addition denied Mota disability benefits under the Social Security Act in error.

## DISPOSITION

The question remains as to whether we should direct that this case be remanded for reconsideration by the Commissioner, or instead remanded solely for calculation of benefits. Generally, when there are gaps in the record or when the ALJ has applied an improper legal standard, courts in this Circuit have remanded for further development of the evidence. See Rosa, 168 F.3d at 83. We believe this to be a case in which there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision," which suggests that a remand solely for a calculation of benefits may be appropriate. Id. However, we are constrained by applicable case law to conclude that, in light of the Commissioner's failure to

28

comprehensively set forth "good reasons" for the weight it assigned to the treating physician's opinion, we must remand Mota's case for further consideration. See Halloran, 362 F.3d at 33; see also Rivera v. Barnhart, 379 F.Supp.2d 599, 604 (S.D.N.Y. 2005) (describing the decision of a court to make a determination of a disability and to remand solely for the calculation of benefits as an "extraordinary action").

## CONCLUSION

For the foregoing reasons, this case is remanded to the Commissioner for further proceedings consistent with this opinion. In particular, on remand the ALJ shall consider all of the evidence of record concerning the treating physician's opinion and weigh it properly pursuant to the applicable regulations. Finally, in light of the length of time that has passed from the filing of the application to the present, we expect the SSA to act promptly on this remand.

**IT IS SO ORDERED.**

Dated:   New York, New York
         March 27, 2007

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Plaintiff

Marshall Green, Esq.
Anne K. Callagy, Esq.
The Legal Aid Society
953 Southern Boulevard
Bronx, NY 10459

Defendant

Susan D. Baird
Office of the U.S. Attorney
Civil Division
86 Chambers Street
New York, NY 10007